R. Rex Parris Esq. (SBN 96567)
*rrexparris@rrexparris.com*
Patricia K. Oliver, Esq. (SBN 193423)
*poliver@rrexparris.com*
Alexander R. Wheeler, Esq. (SBN 239541)
*awheeler@rrexparris.com*
**R. REX PARRIS LAW FIRM**
43364 10th Street West
Lancaster, California 93534
Tel: (661) 949-2595; Fax: (661) 949-7524

David S. Casey, Jr., Esq. (SBN 060768)
*dcasey@cglaw.com*
Gayle M. Blatt, Esq. (SBN 122048)
*gmb@cglaw.com*
Jeremy Robinson, Esq. (SBN 188325)
*jrobinson@cglaw.com*
Jason C. Evans, Esq. (SBN 272932)
*jevans@cglaw.com*
**CASEY GERRY LLP**
110 Laurel Street
San Diego, California 92101
Tel: (619) 238-1811; Fax: (619) 544-9232

*[Additional Counsel Shown on the Following Page]*

# UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GARDINER FAMILY, LLC, a California Limited Liability Company, and ROSEDALE FARMING GROUP, L.P., a California Limited Partnership; <br><br> Plaintiffs, <br><br> v. <br><br> CRIMSON RESOURCE MANAGEMENT CORP., a Colorado Corporation; and DOES 1 through 50; <br><br> Defendants. | **Case No.:  1:15-cv-00751-DAD-JLT** <br><br> **FIRST AMENDED COMPLAINT FOR NEGLIGENCE, TRESPASS, PRIVATE NUISANCE, and PUBLIC NUISANCE** <br><br> **DEMAND FOR JURY TRIAL** |

/ / /

/ / /

/ / /

/ / /

1

**ADDITIONAL COUNSEL**

2

Frank M. Pitre, Esq. (SBN 100077)

3

*fpitre@cpmlegal.com*
Robert B. Hutchinson, Esq. (SBN 045367)

4

*rhutchinson@cpmlegal.com*
Ara R. Jabagchourian, Esq. (SBN 205777)

5

*ajabagchourian@cpmlegal.com*
**COTCHETT, PITRE & McCARTHY, LLP**

6

840 Malcolm Road, Suite 200
Burlingame, California 94010

7

Telephone: (650) 697-6000
Facsimile:  (650) 697-0577

8

9

George Martin, Esq. (SBN 51111)

10

*gmartin@bortonpetrini.com*
**LAW OFFICES OF GEORGE MARTIN, INC.**
5060 California Ave., Ste 700

11

Bakersfield, California  93303-2026
Telephone:  (661) 322-3051

12

Facsimile:  (661) 322-4628

13

Don Ernst, Esq. (SBN 065726)

14

*de@ernstlawgroup.com*
Terry Kilpatrick, Esq. (SBN 163197)

15

*tk@ernstlawgroup.com*
**ERNST LAW GROUP**

16

1020 Palm Street
San Luis Obispo, California 93401

17

Telephone: (805) 541-0300
Facsimile: (805) 541-5168

18

19

Attorneys for Plaintiffs

20

21

22

23

24

25

26

27

28

## INTRODUCTION

1.     Not long after the end of World War II, the Gardiner family began farming land in Kern County. Today, that tradition is carried on in its third generation. Plaintiffs Gardiner Family, LLC, along with Rosedale Farming Group, L.P., now operate Rosedale Ranch, one of the largest almond orchards in Kern County ("Rosedale Ranch"). Almond trees are one of California's most productive and lucrative crops, and the trees can be productive for up to 30 years.

2.     Like almost all other farmers in the San Joaquin Valley, Gardiner depends heavily upon the Central Valley aquifer system to water the orchards. Historically, the San Joaquin Valley had abundant water from underground water sources (aquifers) and surface water.

3.     Recently, Rosedale Ranch has struggled with leaf scorch on its almond trees. Investigation indicated that the problems likely arose from extremely high salinity in the water used for irrigating the orchards. Salt water pulled up during oil production contains high concentrations of sodium, chloride, and boron. All three elements are toxic to almond trees. Chloride is readily absorbed through tree roots and then transported to leaves where it can be observed in visible signs of leaf scorch. Boron accumulates in the younger tissue causing developing shoots to "die back." Sodium can accumulate in woody tissue and be released to the leaves years later.

4.     This contaminated water from oil extraction, often called "produced water," gets into the underground aquifers when oil companies flush it back down abandoned or idle oil wells without proper precautions. Across from Rosedale Ranch, Defendant Crimson Resources Management has disposed of more than one billion gallons of salt water in the last six years.



5.     Gardiner contacted the California Division of Oil, Gas and Geothermal Resources ("DOGGR") about the high salinity water. DOGGR oversees "the drilling, operation, maintenance, and plugging and abandonment of . . . oil, gas, and geothermal wells" in California.

6.   Gardiner reported the contamination to the deputy at DOGGR in charge of Kern County. DOGGR represented to Gardiner that they detected no problems. Gardiner also met with the State Supervisor of Oil & Gas, but never heard anything further.

7.   Gardiner ultimately retained counsel to investigate the problems and learned that it did not appear DOGGR investigated whether Crimson may have caused the problems.

## PARTIES

8.   Plaintiff Gardiner Family, LLC, is a limited liability company organized and existing under the laws of the State of California.

9.   Plaintiff Rosedale Farming Group, L.P. is a limited partnership organized and existing under the laws of the State of California.

10.   Defendant Crimson Resource Management Corp. ("Crimson") is a corporation organized and existing under the laws of the State of Colorado and with its principal place of business located there.  Crimson engaged in oil production activities in Bakersfield, California.

11.   All of the Defendants are responsible for the harm caused because all of them knew, or should have known that their operations and acts would ultimately cause the migration of pollutants onto Plaintiff's land or into the water supply used by Plaintiff and others in the community. Defendants, Does 1 through 100, inclusive, are sued herein under fictitious names. Their true names and capacities are unknown to Plaintiff at this time. When their true names and capacities are ascertained, Plaintiff will amend this Complaint by inserting their true names and capacities herein. Plaintiff is informed and believes and therein alleges that each of the fictitiously named Defendants are responsible in some manner for the occurrences herein alleged, and that Plaintiff's damages as herein alleged were proximately caused by such Defendants.

12.   Crimson and DOES 1 through 100 (collectively "Defendants") were in some manner responsible for the acts alleged herein and the harm, losses and damages suffered by Plaintiffs as alleged hereinafter.  Plaintiffs also informed and believes that, while participating in such acts, each Defendant was the agent, alter ego, conspirator, and aidor and abettor of the other Defendants and was acting in the course and scope of such agency and/or acted with the permission, consent, authorization or ratification of other Defendants.

## JURISDICTION AND VENUE

13.    This Court has diversity jurisdiction over the action pursuant to 28 U.S.C. § 1332(a), because plaintiffs and all defendants are citizens and residents of different states and the amount in controversy exceeds $75,000.00, excluding interest and costs.

14.    Venue is proper in this district under 28 U.S.C. §1391 because defendants engaged and continue to engage in substantial conduct relevant to plaintiff's claims within this District and have caused harm to plaintiffs in this District.

## STATEMENT OF THE CASE

### I.    FARMING & OIL

15.    Rosedale Ranch is located in the San Joaquin Valley, the most productive agricultural region in the United States. *"25% of the nation's table food"* is grown this valley,[1] including more than 250 unique crops.[2]  Grapes, raisins, nuts (mostly almonds and pistachios), oranges, peaches, garlic, tangerines, tomatoes, and kiwi are just a few of the kinds of produce grown.  In total, California supplies up to 50% of the nation's fruits, nuts, and vegetables.

16.    Farms in the San Joaquin Valley depend heavily upon fresh underground water to maintain consistent food production, especially in drought years. Historically, water was so plentiful, the state built the California Aqueduct through the Valley.  The aqueduct and aquifers in this region supply drinking water to 25+ million people.[3]

17.    The San Joaquin Valley is also the primary region for California's oil production.  The largest county in the Valley, Kern County, produces 71% of all oil in California.

18.    Oil production creates dangerous waste products – most of which consist of naturally occurring chemicals in the salt water that comes up during all oil production activities. The salt water pulled up during oil production is, at the very minimum, as salty as sea water, and often drastically more so; sometimes upwards of thirty times saltier. As a result, the salts from the sodium chloride and other naturally occurring chemicals from the oil production can pollute fresh water.

19.    On average, for every one (1) barrel of oil pumped up, an oil company pumps up ten

---

[1] See, http://pubs.usgs.gov/circ/circ1182/pdf/06SanJoaquinValley.pdf at 23.
[2] See, http://www.epa.gov/region9/strategicplan/sanjoaquin.html.
[3] See, http://www.water.ca.gov/swp/.

1  (10) barrels of salt water.

2      20.   Salt water comes up in even greater quantities near Rosedale Ranch.  For example, in

3  the last eight years, Crimson's average ratio is 1 barrel of oil to 35 barrels of salt water.

4      21.   Crimson, however, failed to follow industry standards to ensure confinement of the salt

5  water.  The mishandling of salt water is polluting fresh water needed by Gardiner.  High amounts of

6  chloride (a component of salts) and boron in the water injected by the Oil Companies underground

7  makes the fresh water unsuitable for irrigation.

8      22.   Rosedale Ranch brings this lawsuit to recover costs paid for, and to be paid for,

9  remediation of environmental damage caused by Crimson during the oil production and waste

10  disposal processes and for damages to Gardiner's land, crops, and trees.  Rosedale Ranch further

11  seeks disgorgement of Crimson's associated profits.

12  **II.   OIL PRODUCTION**

13      23.   Most oil production in California comes from

14  traditional oil wells that are made by first drilling a hole

15  (called a wellbore).  After drilling the hole, the oil company

16  inserts a metal pipe (called casing), and cement is pumped

17  down the casing.  "When the cement hardens, it forms a

18  bond between the walls of the wellbore and the outside of the

19  casing. This bond protects groundwater . . . from

20  contamination."  Holes (called perforations) are made at the

21  bottom of the well casing allowing oil "to move into the

22  casing, and up to the surface."[4]  Surface casing is also

23  industry standard for oil wells to provide an additional

24  protection for all fresh water like that below Rosedale Ranch.

25      24.   Oil production results in the creation of

26  hazardous waste products that must be disposed of properly

27  to prevent pollution to soil, air, and water.



28

---

[4] See, http://www.conservation.ca.gov/dog/faqs/Pages/Index.aspx.

25.   Near the Rosedale Ranch, oil production activities create the following waste that must be disposed of properly to prevent pollution of the underground water supplies:

  o  ***Salt water (also called "brine" or "produced water"):*** Petroleum is often created at the site of ancient seas.  As a result, petroleum deposits often exist in areas with salt water.  Other naturally occurring chemicals are often present too.  The salt water and many naturally occurring chemicals get pulled up during the oil production process.  At the surface, formation water and oil are separated, and salt water is pumped through pipelines to disposal wells like those near Rosedale Ranch.

  o  ***Drilling mud and drill cuttings:***  Oil companies lubricate drill bits with drilling mud, leaving behind a mixture of drilling mud (clay, water, and chemicals) and drill cuttings that come up during the drilling process.

  o  ***Hydraulic flowback*** consists of fluids and chemicals used for hydraulic fracturing mixed with naturally occurring chemicals and fluids that flow back to the surface during and after the completion of hydraulic fracturing.

26.   Crimson must dispose of some or all of these waste products by re-injecting them underground.  Crimson converted old oil wells into waste disposal wells.  Most of the wells are over 40 years old, some over 70 years old.  The conversion of older wells presents a number of potential concerns including the following:

  o  These wells have older casings near the end of their life.

  o  The casings are made out of less resilient materials.

  o  There are typically a large number of perforations and even damage to the casings that required repairs.

27.   Injection well activities have substantially increased in the last ten years, and the volume of salt water injected into waste



Salt Water Injection
(millions of Bbl)

disposal wells doubled.  (See chart). In 2013, the total amount of salt water injected underground was 832 million barrels

28.    Injecting salt water at a high pressure will: (1) increase the distance the salt water travels; (2) shorten the life of an injection well; and (3) likely crack the rock or sand, creating openings for migration of the injected salt water into fresh water.

### III.   INJECTION WELLS NEAR ROSEDALE RANCH

29.    *Crimson failed to comply with well-established industry standards associated with pressure tests of the relevant wells.* For example, Crimson failed to properly report injection pressure in at least 15 of the 18 waste disposal wells it operates. Crimson, moreover, reported pressures that were often at or above 1200 psi with the highest injecting at 1320, 1375, and 1379. *These pressures not only part the "sands," Crimson increased the distance the salt water travels by injection at such high pressures.*

30.    *Crimson did not conduct an area of review* to ensure that there were no idle wells near the salt water injection wells.  This review is needed to ensure that there are no wells that would serve as conduits (similar to straws) drawing the salt water from the deep water aquifer up to the top part of the aquifer.[5]  There are numerous idle and abandoned wells near Rosedale Ranch.

31.    Crimson did not provide an injection plan indicating treatment or planning of any of the injected salt water as set forth under industry standards.  Crimson did not provide a chemical analysis of the injection liquid disposed of under Rosedale Ranch as established under industry standard. Crimson did not prepare any geological studies to confirm where the base of fresh water is in comparison to where this salt water was ejected.  Indeed, Crimson injected most of the salt water in the base of the sands under the aquifer.

32.    In the last six years, Crimson injected over 1.4 billion gallons of salt water into these wells in the Rosedale oil fields. The 1.4 billion gallons of salt water is *eight  times greater* than the 176 million gallons of oil that spilled into the Gulf of Mexico after the BP oil spill.

---

[5] A July 1989 study of the Government Accountability Office entitled *"Drinking Water: Safeguards are not Preventing Contamination from Injected Oil and Gas Wastes"* determined that in the known cases of water contamination, injected brine generally travelled up into improperly plugged abandoned wells and entered into drinking water through cracks in these old wells. See, http://www.gao.gov/assets/150/147952.pdf

33.     Fresh water under Rosedale Ranch is at least 2,900 feet below the surface.  Crimson injected salt water near the base of fresh water.

34.     Crimson did not inject into any waste disposal wells with surface casing protecting the base of fresh water. Most surface casings on Crimson's salt water disposal wells go 200 to 500 feet below the surface, leaving a single layer of casing to protect fresh water.

35.     Crimson also uses injections near Rosedale Ranch to stimulate well production through a process known as hydraulic fracturing. One of those wells, Crimson well API 03048729, is located in the middle of waste disposal wells near Rosedale Ranch.

36.     In sum, Crimson is injecting salt water around the Rosedale Ranch in damaged oil wells without following the regulations designed to ensure the confinement of salt water and safety of underground water relied upon by farmers in the San Joaquin Valley.

## IV.     IMPACT ON THE ORCHARDS OWNED BY ROSEDALE RANCH

37.     The injected salt water has reached Rosedale Ranch. The chloride from the salt water has caused leaf scorch and resulted in an exceedingly poor growing environment. Because of this salt water contamination, Gardiner will be forced to remove hundreds of acres of almond trees.

38.     The almond orchard in Rosedale Ranch has also seen considerable decline in nut production due to high concentrations of salt (TDS, chloride, and sodium) and boron in the water supply.  Chloride toxicity impacts foliar growth, carbohydrates needed for nut production, and ultimately tree health and production potential. Moreover, high boron is affecting the development of new shoots which will affect future growth, flowering, and nut development.

39.     The water pollution forced Rosedale Ranch to stop using one irrigation well and drill another well to continue farming.

40.     The damage to Rosedale Ranch caused by the defendants' oil exploration and extraction activities is extensive and ongoing.

/ / /

/ / /

# FIRST CLAIM FOR RELIEF

## NEGLIGENCE

41.   Rosedale Ranch incorporates by reference each of the preceding paragraphs as though fully set forth herein.

42.   Rosedale Ranch owns an orchard within a short distance of the storage tanks, pipelines, and waste disposal wells used by Crimson and the other defendants (hereafter collectively referred to as "Crimson"). Crimson has a duty to use reasonable care in the transporting of the salt water, and in the construction, drilling, operation, maintenance, and abandonment of all operations.  However, Crimson built waste disposal wells in direct contradiction to established industry standards.

43.   Crimson also breached their duty by negligently and carelessly constructing, drilling, operating, maintaining and/or abandoning underground injection wells, pipelines, and storage tanks, and thus they caused releases, spills, emissions, and discharges of hazardous gases, chemicals, and industrial/hazardous wastes on Rosedale Ranch (either directly from surface activities or leakage from pipelines or wells or through subsurface trespass).

44.   This breach directly increased the concentration of chemicals, like chloride, in Rosedale Ranch's water to such an extent that trees have been injured, and nut production is in decline. As a direct result, Rosedale Ranch will be forced to remove many dead or dying trees.

45.   At all times herein mentioned, Crimson had an obligation to follow industry standards with respect to construction, drilling, operation, and maintenance of waste disposal wells.  Crimson, however, fell below proper industry standard,  including failing to file a report indicating the discharge of waste to the regional board; failing to properly isolate the gas and oil production material from underground water; failing to provide well casing that can withstand anticipated burst and tension forces; failing to provide proper conductor, surface, intermediate and production casings; failing to properly test and inspect safety devices associated with well activities every six months; failing to provide the proper data requirements associated with well activity, including but not limited to casing diagrams, reservoir fluid data, reservoir characteristics, and the monitoring system to be utilized to ensure salt water is contained.

46.     As a direct result of this wrongful conduct, Rosedale Ranch suffered and will suffer economic damages including, but not limited to, costs for remediation and clean-up of the pollution on this property and to the groundwater, lost and/or diminished use of the property, loss of earning capacity of the property, loss of the investment placed into the almond orchard, and loss of past and future income from the orchard.

47.     The actions by Crimson injured hundreds of almond tree acres, and Rosedale Ranch should be awarded double or treble damages under Code of Civil Procedure section 733 and Civil Code section 3346 and attorney's fees and costs under Code of Civil Procedure section 1021.9.

48.     As a further legal result of this wrongful conduct, Rosedale Ranch suffered, and will continue to suffer the loss of the quiet use and enjoyment of its property in addition to all of Rosedale Ranch's general damages in an amount to be set forth according to proof at trial.

49.     In addition, Rosedale Ranch should be awarded attorney's fees under Code of Civil Procedure section 1021.5 because the successful prosecution of this action will confer a significant benefit both pecuniary and non-pecuniary on the general public and a large class of persons by abating environmental harm and preventing future harm in the San Joaquin Valley.  Further, the necessity and financial burden of private enforcement makes such an award appropriate as the litigation is not economically feasible or viable for Rosedale Ranch to pursue on its own at its own expense, and such fees should not in the interest of justice be paid out of the recovery, if any.

## SECOND CLAIM FOR RELIEF

### TRESPASS

50.     Rosedale Ranch incorporates by reference each of the preceding paragraphs as though fully set forth herein.

51.     In the construction, operation, maintenance and/or abandonment of underground injection wells, production wells, storage tanks, and pipelines, Crimson intentionally, recklessly, willfully, and/or negligently caused, and continue to cause, toxic and/or hazardous substances (including, but not limited to salt water and hazardous chemicals) to enter Rosedale Ranch's orchard by spills, releases, and migration from the Crimson's underground injection wells, production wells, storage tanks, and pipelines.

52. Rosedale Ranch did not consent to this entry.

53. As a direct and legal result of said wrongful conduct, Rosedale Ranch suffered or will suffer economic damages including, but not limited to, costs for remediation and clean-up of the pollution on the Rosedale Ranch and to the groundwater, lost and/or diminished use of the property, loss of earning capacity of the property, loss of the investment placed into the almond orchard, and loss of past and future income from the almond orchard.

54. Crimson's actions were a substantial factor in causing the harm to Rosedale Ranch.

55. Crimson took actions that were willful and malicious including the following:

- Crimson failed to conduct the review needed to confirm that when they injected salt water underground, it would be confined to geological levels well below fresh water.

- Crimson used pressures sufficient to force the salt water through the well perforations and into the sand. The pressure utilized by Crimson to inject salt water into the sand greatly exceeded the maximum pressure allowed by law.

- Over the last six years, Crimson injected 1.4 billion gallons of salt water.

- Crimson failed to prepare the casing diagrams and failed to check nearby wells to confirm that they could withstand the pressure and were free of any leaks.

- The waste disposal wells used by Crimson and the nearby abandoned or idle wells have steel and cement casings that are often 50-70 years old. These wells have been damaged by years of subsidence. There was little reason to believe these wells could safely transfer the salt water – *especially given the prolonged exposure under pressure to massive amounts of salt water.*

56. Crimson's actions resulted in the pollution of one of the aquifers in the San Joaquin Valley used to pump water for farms and used for drinking water by many Californians. Crimson took these actions with a willful and knowing disregard of the rights and safety of the community. Rosedale Ranch should, therefore, be awarded punitive and exemplary damages under Civil Code section 3294 sufficient to punish Crimson for engaging in this conduct and to deter similar conduct in the future.

57. The actions by Crimson injured hundreds of almond tree acres, and Rosedale Ranch

1   should be awarded double or treble damages under Code of Civil Procedure section 733 and Civil

2   Code section 3346 and attorney's fees and costs under Code of Civil Procedure section 1021.9.

3        58.   As a further result of this wrongful conduct, Rosedale Ranch suffered, and will continue

4   to suffer, the loss of the quiet use and enjoyment of its property in addition to all of Rosedale Ranch's

5   general damages in an amount to be set forth according to proof at trial.

6        59.   In addition, Rosedale Ranch should be awarded attorney's fees under Code of Civil

7   Procedure section 1021.5 because the successful prosecution of this action will confer a significant

8   benefit both pecuniary and non-pecuniary on the general public and a large class of persons by

9   abating environmental harm and preventing future harm in the San Joaquin Valley.  Further, the

10  necessity and financial burden of private enforcement makes such an award appropriate as the

11  litigation is not economically feasible or viable for Rosedale Ranch to pursue on its own at its own

12  expense, and such fees should not in the interest of justice be paid out of the recovery, if any.

**THIRD CLAIM FOR RELIEF**

**PRIVATE NUISANCE**

15       60.   Plaintiff incorporates by reference each of the preceding paragraphs as though fully set

16  forth herein.

17       61.   Crimson failed to exercise reasonable care in the course of constructing, drilling,

18  operating, maintaining, and/or abandoning oil production wells, storage tanks, pipelines, and

19  underground injection wells. Crimson continues to allow spills, release, and /or migration of

20  pollutants to the surrounding area including Rosedale Ranch. Crimson created a condition that is

21  harmful to the health and free use of the property so as to seriously interfere with comfortable

22  enjoyment of their life and property.  Rosedale Ranch suffers from the threat of continued spills,

23  release, and /or migration of pollutants to the surrounding area including the orchard.

24       62.   The continuing condition created by Crimson harmed Rosedale Ranch. This harm

25  includes exposure to an array of pollutants and to chloride, a component of salt, in the water and on

26  the property owned by Rosedale Ranch.

27       63.   Rosedale Ranch did not consent to Crimson's conduct.

28       64.   An ordinary person of reasonable sensibility would reasonably be annoyed and/or

1  disturbed by the condition created by Crimson.

2      65.   Crimson's aforementioned conduct constitutes a nuisance within the meaning of section

3  3749 of the Civil Code in that it is injurious to health and/or offensive to the senses of Rosedale

4  Ranch and/or unreasonably interferes with the comfortable enjoyment of their orchard and/or the free

5  and customary use of Rosedale Ranch's property.

6      66.   As a direct and legal result of said wrongful conduct, Rosedale Ranch suffered, and will

7  continue to suffer, economic damages including, but not limited to lost and/or diminished use of its

8  property, and the diminished fair market value of the property due to the stigma associated with the

9  pollution of the property.

10      67.   The actions by Crimson injured hundreds of almond tree acres, and Rosedale Ranch

11  should be awarded double or treble damages under Code of Civil Procedure section 733 and Civil

12  Code section 3346 and attorney's fees and costs under Code of Civil Procedure section 1021.9.

13      68.   As a further legal result of this wrongful conduct, Rosedale Ranch suffered, and will

14  continue to suffer, the loss of the quiet use and enjoyment of its property in addition to all of

15  Rosedale Ranch's general damages in an amount to be set forth according to proof at trial.

16      69.   The seriousness of Crimson' wrongful conduct referenced above outweighs the public

17  benefits of Crimson' oil and gas production because separation of the salt water from oil, transporting

18  of salt water in pipelines, and injection of salt water deprives communities of peaceful enjoyment of

19  their properties, diminishes the value of surrounding properties and neighborhoods, causes pollution

20  to homes, farms and local water supplies, and are out of character for Rosedale Ranch's locality and

21  land.  In comparison, the social value and primary purpose of the transportation of salt water and

22  injection underground in this community is the maximization of profit with no incentive to take the

23  necessary precautions to avoid the loss of property values, nor to ensure the safety and environmental

24  integrity of the disposal of salt water in short term injection wells.

25      70.   Crimson took actions that were willful and malicious including the following:

26                o   Crimson failed to conduct the review needed to confirm that when they injected salt

27                    water underground, it would be confined to geological levels well below the fresh

28                    water.

- o Crimson used pressures sufficient to force the salt water through the well perforations and into the sand. The pressure utilized by Crimson to inject salt water into the sand greatly exceeded the maximum pressure allowed by law.
- o Over the last six years, Crimson injected 1.4 billion gallons of salt water.
- o Crimson failed to prepare the casing diagrams and failed to check nearby wells to confirm that they could withstand the pressure and were free of any leaks.
- o The waste disposal wells used by Crimson and the nearby abandoned or idle wells have steel and cement casings that are often 50-70 years old. These wells have been damaged by years of subsidence. There was little reason to believe these wells could safely transfer the salt water – *especially given the prolonged exposure under pressure to massive amounts of salt water.*

71. In sum, the failure of Crimson to comply with the California Code of Regulations resulted in their pollution of one of the aquifers in the San Joaquin Valley used to pump water for farms and used for drinking water by Californians. Crimson took these actions with a willful and knowing disregard of the rights and safety of the community. Rosedale Ranch should, therefore, be awarded punitive and exemplary damages under Civil Code section 3294 sufficient to punish Crimson for engaging in this conduct and to deter similar conduct in the future.

72. In addition, Rosedale Ranch should be awarded attorney's fees under Code of Civil Procedure section 1021.5 because the successful prosecution of this action will confer a significant benefit both pecuniary and non-pecuniary on the general public and a large class of persons by abating environmental harm and preventing future harm in the San Joaquin Valley. Further, the necessity and financial burden of private enforcement makes such an award appropriate as the litigation is not economically feasible or viable for Rosedale Ranch to pursue on its own at its own expense, and such fees should not in the interest of justice be paid out of the recovery, if any.

## FOURTH CLAIM FOR RELIEF

### PUBLIC NUISANCE

73. Plaintiff incorporates by reference each of the preceding paragraphs as though fully set forth herein.

74.    Crimson failed to exercise reasonable care in the course of constructing, drilling, operating, maintaining, and/or abandoning oil wells, pipelines, and injection wells, and Crimson continues to allow toxic waste, gas, salt water, and hazardous chemicals to be released, spill, or migrate to the surrounding areas including Rosedale Ranch's orchard and water wells.  Crimson created a continuing condition that is harmful to Rosedale Ranch's health and free use of the orchard so as to seriously interfere with comfortable enjoyment of their life and property.

75.    The continuing conditions created by Crimson harmed residents and farms in Rosedale. The harmful conditions included significant decrease in the value of Rosedale Ranch's land, and pollution of Rosedale Ranch's land and water wells from toxic waste, gas, and water emanating or migrating from Crimson' injection wells. This includes the pollution of Rosedale Ranch's water wells, resulting in elevated chloride levels in the soil and water used for farming at levels that exceed the secondary maximum contaminant levels.

76.    Rosedale Ranch did not consent to Crimson's conduct.

77.    Crimson's aforementioned conduct constitutes a nuisance under section 3749 of the Civil Code because it is injurious to health or offensive to the senses of Rosedale Ranch. It also unreasonably interferes with the comfortable enjoyment of Rosedale Ranch's properties and the free use, in the customary manner, of Rosedale Ranch's property.

78.    As a result of Crimson's conduct, Rosedale Ranch suffered a type of harm that is different from the type of harm suffered by the general public. As a direct and legal result of said wrongful conduct, Rosedale Ranch suffered and will suffer economic damages including, but not limited to lost and/or diminished use of its property, and the diminished fair market value of the property due to the stigma associated with the pollution of the property.

79.    The actions by Crimson injured hundreds of almond tree acres, and Rosedale Ranch should be awarded double or treble damages under Code of Civil Procedure section 733 and Civil Code section 3346 and attorney's fees and costs under Code of Civil Procedure section 1021.9.

80.    As a further legal result of this wrongful conduct, Rosedale Ranch suffered, and will continue to suffer, the loss of the quiet use and enjoyment of its property in addition to all of Rosedale Ranch's general damages in an amount to be set forth according to proof at trial.

81.     An ordinary person of reasonable sensibilities would be reasonably annoyed and/or disturbed by the condition created by Crimson.

82.     The seriousness of Crimson's wrongful conduct referenced above outweighs the public benefits of Crimson's oil and gas production because separation of the salt water from oil, transporting of salt water in pipelines, and injection of salt water deprives communities of peaceful enjoyment of their properties, diminishes the value of surrounding properties and neighborhoods, causes pollution to homes, farms and local water supplies, and are out of character for the locality and land.  In comparison, the social value and primary purpose of the transportation of salt water and injection underground in this community is the maximization of profit with no incentive to take the necessary precautions to avoid the loss of property values, nor to ensure the safety and environmental integrity of the disposal of salt water in short term injection wells.

83.     Crimson's conduct, including constructing, drilling, operating, maintaining, and/or abandoning of oil wells, pipelines, and waste disposal wells, were all substantial factors in causing the diminution of value to Rosedale Ranch's property and in causing probable continuing damage from pollution.  Further, the likelihood of continuing harm remains due to the potential pollution of Rosedale Ranch's property and the underlying aquifers.

84.     Rosedale Ranch further alleges that as a consequence of Crimson's acts and/or failures to act, this public nuisance must be abated.

85.     Crimson took actions that were willful and malicious including the following:

- o   Crimson failed to conduct the review needed to confirm that when they injected salt water underground, it would be confined to geological levels well below the fresh water.
- o   Crimson used pressures sufficient to force the salt water through the well perforations and into the sand.  The pressure utilized by Crimson to inject salt water into the sand greatly exceeded the maximum pressure allowed by law.
- o   Over the last six years, Crimson injected 1.9 billion gallons of salt water.
- o   Crimson failed to prepare the casing diagrams and failed to check nearby wells to confirm that they could withstand the pressure and were free of any leaks.

    o   The waste disposal wells used by Crimson and the nearby abandoned or idle wells have steel and cement casings that are often 50-70 years old.  These wells have been damaged by years of subsidence.  There was little reason to believe these wells could safely transfer the salt water – *especially given the prolonged exposure under pressure to massive amounts of salt water.*

86.    In sum, the failure of Crimson to comply with the California Code of Regulations resulted in their pollution of one of the aquifers in the Central Valley used to pump water for farms in the most significant agricultural area of the world.  Crimson took these actions with a willful and knowing disregard of the rights and safety of the community.  Rosedale Ranch should, therefore, be awarded punitive and exemplary damages under Civil Code section 3294 sufficient to punish Crimson for engaging in this conduct and to deter similar conduct in the future.

87.    In addition, Rosedale Ranch should be awarded attorney's fees under Code of Civil Procedure section 1021.5 because the successful prosecution of this action will confer a significant benefit both pecuniary and non-pecuniary on the general public and a large class of persons by abating environmental harm and preventing future harm in the San Joaquin Valley.  Further, the necessity and financial burden of private enforcement makes such an award appropriate as the litigation is not economically feasible or viable for Rosedale Ranch to pursue on its own at its own expense, and such fees should not in the interest of justice be paid out of the recovery, if any.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as set forth below:

1.    For all economic losses suffered by Plaintiff related to property damage, lost use of property, lost profits, denial of quiet enjoyment and use of property, diminution in the fair market value of property, cost of repair and remediation, impairment of marketability of property, losses caused by the pollution, stigma damages, and any other such economic losses to be set forth according to proof at trial;

2.    For general damages according to proof at trial;

/ / /

3.      For an award for double or treble damages under California Code of Civil Procedure section 733 and California Civil Code section 3346;

4.      For an award of punitive and exemplary damages;

5.      For an injunction directing Defendants, and each of them and their agents, servants, and employees, and all persons acting under, in concert with, or for them, to remediate the pollution which they have caused;

6.      For an award of the benefits obtained by the wrongful actions of Defendants;

7.      For reasonable attorneys' fees and cost of suit pursuant to California Code of Civil Procedure sections 1021.5 and 1021.9;

8.      For interest at the legal rate on all amounts awarded;

9.      For such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues triable of right by jury.


DATE:                                              R. REX PARRIS LAW FIRM

                                                    /s/ Patricia K. Oliver

                                                   Patricia K. Oliver
                                                   *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I, Patricia K. Oliver, an attorney, certify that on November 29, 2016, I served the above and foregoing **FIRST AMENDED COMPLAINT FOR NEGLIGENCE, TRESPASS, PRIVATE NUISANCE, AND PUBLIC NUISANCE**, by causing true and accurate copies of such paper to be filed and transmitted to the persons shown on the attached service list via the Court's CM/ECF electronic filing system, on this the 29th day of November, 2016

        */s/ Patricia K. Oliver* .
        Patricia K. Oliver

## **ATTACHMENT TO CERTIFICATE OF SERVICE**

GARDINER FAMILY, LLC, et al. v. CRIMSON RESOURCE MANAGEMENT CORP. et al.
USDC Case No. 1:15−CV−00751−DAD-JLT

| | |
|---|---|
| Francis M. Goldsberry II, Esq. | Attorneys for Defendant |
| *mgoldsberry@somachlaw.com* | CRIMSON RESOURCE MANAGEMENT |
| Richard S. Deitchman, Esq. | CORP. |
| *rdeitchman@somachlaw.com* | |
| Jason T. Canger, Esq. | |
| *jcanger@somachlaw.com* | |
| **SOMACH SIMMONS & DUNN** | |
| 500 Capitol Mall, Suite 1000 | |
| Sacramento, California 95814 | |

David S. Casey, Jr., Esq.  
 *dcasey@cglaw.com*  
Gayle M. Blatt, Esq.  
 *gmb@cglaw.com*  
Jeremy Robinson, Esq.  
 *jrobinson@cglaw.com*  
Jason C. Evans, Esq.  
 *jevans@cglaw.com*  
**CASEY GERRY SCHENK FRANCAVILLA**  
   **BLATT & PENFIELD LLP**  
110 Laurel Street  
San Diego, California 92101

Attorneys for Plaintiff,  
GARDINER FAMILY, LLC and ROSEDALE  
FARMING GROUP, L.P.

Frank M. Pitre, Esq.  
 *fpitre@cpmlegal.com*  
Robert B. Hutchinson, Esq.  
 *rhutchinson@cpmlegal.com*  
**COTCHETT, PITRE & McCARTHY, LLP**  
840 Malcolm Road, Suite 200  
Burlingame, California 94010

Attorneys for Plaintiff,  
GARDINER FAMILY, LLC and ROSEDALE  
FARMING GROUP, L.P.

Don Ernst, Esq.  
 *de@ernstlawgroup.com*  
Terry Kilpatrick, Esq.  
 *tk@ernstlawgroup.com*  
**ERNST LAW GROUP**  
1020 Palm Street  
San Luis Obispo, California 93401

Attorneys for Plaintiff,  
GARDINER FAMILY, LLC and ROSEDALE  
FARMING GROUP, L.P.

George Martin, Esq.  
 *gmartin@bortonpetrini.com*  
**LAW OFFICES OF GEORGE MARTIN, INC.**  
5060 California Ave., Ste 700  
Bakersfield, California  93303-2026

Attorneys for Plaintiff,  
GARDINER FAMILY, LLC and ROSEDALE  
FARMING GROUP, L.P.